## UNITED STATES BANKRUPTCY COURT
### FOR SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **Case No. 15-35530-H5-7** |
| **BLUEWATER INDUSTRIES, LP,** | § | |
| | § | **Chapter 7** |
| Debtor. | § | |
| | § | |
| **RONALD J. SOMMERS, CHAPTER 7 TRUSTEE FOR BLUEWATER INDUSTRIES, L.P.,** | § § § | |
| | § | |
| Plaintiff, | § | |
| | § | **Adversary No. _____** |
| v. | § | |
| | § | |
| **PARKER-HANNIFIN CORPORATION,** | § | |
| | § | |
| Defendant. | § | |

### ORIGINAL COMPLAINT

Ronald J. Sommers ("Trustee") is the chapter 7 trustee for Bluewater Industries, L.P. ("Bluewater"). Defendant Parker Hannifin Corporation ("Parker") manufactured a defective product that caused Bluewater to suffer millions of dollars in damages and, ultimately, to become insolvent. Bluewater is entitled to judgment against Parker for the damages it has incurred. Accordingly, the Trustee files this Original Complaint against Parker and in support would show the Court as follows:

### PARTIES

1.      The Trustee is the duly-appointed trustee for the chapter 7 estate of Bluewater, a Texas limited partnership. The Trustee may be served through his undersigned counsel.

1

2.      Defendant Parker is an Ohio corporation that regularly conducts business in the State of Texas.  Parker may be served through its registered agent for service of process in the State of Texas: CT Corp. System, 1999 Bryan St., Suite 900, Dallas, Texas 75201-3136.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157.

4.      Venue is proper in this district pursuant to 28 U.S.C. § 1409(a) because the chapter 7 case to which this proceeding relates is pending in this district.

## FACTUAL BACKGROUND

**A.  ATP engaged Bluewater to perform work on the Clipper Project.**

5.      ATP Oil & Gas Corporation ("ATP") was a publically-traded company engaged in the exploration and production of oil and gas, primarily offshore.  It was the operator and a sub-lessee of a certain offshore lease in the Gulf of Mexico know as Green Canyon Block 300 (the "Lease").

6.      ATP began development of the Lease, including the drilling of deepwater oil and gas wells, naming it the "Clipper Project."  Full development of the Clipper Project required what is known as a subsea tieback—essentially, an underwater pipeline from the wells on the Lease to a deepwater platform.  ATP engaged Bluewater to provide equipment, materials, construction and other work on the subsea tieback as part of the Clipper Project.

7.      ATP had frequently engaged Bluewater for work similar to the Clipper Project.  The terms of their engagements were set out in (i) a Master Service Agreement

2

dated February 1, 2008 (hereafter, "MSA") and (ii) an Amended and Restated Master Services Agreement dated September 11, 2009 (the "ARMSA").

8.    While the MSA and the ARMSA set out the general terms of ATP's engagements with Bluewater, the requirements for specific projects or jobs were described in work orders issued by ATP under the relevant master agreement.   For Bluewater's work on the Clipper Project,  ATP issued a work order under the ARMSA dated February 1, 2012 ("Work Order II").

**B.    Bluewater engaged Parker to manufacture the Umbilical.**

9.    Among other goods and services Bluewater was to provide ATP under Work Order II, Bluewater was to furnish ATP with an "electro-hydraulic umbilical" (the "Umbilical") to be installed and connected to a floating production platform (the "Platform") located near the Clipper Project site.  The Umbilical was to provide both electrical and hydraulic connections between the Platform and the Clipper wells.  The electrical connection allowed flow of hydrocarbons from the wells to be shut down or opened up from the Platform, and the hydraulic connection allowed delivery of various fluids to the wells for their continued operation and development.

10.    Because of its technical requirements and length, the Umbilical had to be custom-built for the Clipper Project.  Bluewater did not design or manufacture any portion of the Umbilical.  Instead, Bluewater engaged Parker to design and manufacture the Umbilical, relying on Parker's representations that it had the experience and facilities necessary to manufacture the Umbilical to the required specifications, free from defects and in a good and workmanlike manner.  Ultimately, Bluewater discovered that Parker's representations were incorrect.

3

11.     Bluewater executed a Purchase Order with Parker dated August 22, 2011, covering the design and manufacture of the Umbilical (the "Original Purchase Order"), which pre-dated Work Order II between ATP and Bluewater.   After the Original Purchase Order was signed, ATP changed some of the specifications for the subsea tieback, including the required length of the Umbilical.  This change was reflected in a revised Purchase Order executed by Parker and Bluewater on or about June 1, 2012 (the "Revised Purchase Order, and together with the Original Purchase Order, the "Purchase Order"). Parker contends that the Purchase Order is governed by the laws of the State of Ohio and that Bluewater is bound by various terms and conditions (the "Terms and Conditions") governing the Purchase Order, including but not limited to liability limitations and limited warranty requirements. Bluewater cannot confirm that the Terms and Conditions are part of the Purchase Order.

12.     The total price for the Umbilical under the Purchase Order, as revised, was over $13 million.  Parker again represented that it could perform the work necessary to design and manufacture the much longer Umbilical as now required under the Purchase Order free from defects and in a good and workmanlike manner.

13.     The Purchase Order required Parker to manufacture the Umbilical free of defects.

**C.      Parker designed and manufactured the defective Umbilical.**

14.     Parker performed all design and manufacturing work on the Umbilical at Parker's facility in Freeport, Texas.  The facility did not provide the type of environment required to safeguard the integrity of the Umbilical's sheathing during the manufacturing process, but that fact was not disclosed to Bluewater.   A proper environment for the

4

splicing (described below) of the components and outer jacket of the Umbilical would require a "clean room" that was temperature-controlled and free of any airborne particles. In contrast, Parker's facility was neither temperature-controlled nor "clean."

15.     As it was designed by Parker, the Umbilical in cross-section is a circular bundle containing two separate, but duplicative, electrical conductors called "electrical quads" and fifteen tubes for hydraulic and other fluids.  The entire bundle is housed within and held together by an exterior jacket.  The electrical quads are positioned on the outer portion of the bundle (but within the exterior jacket), with the hydraulic tubes located in between them.



16.     Each electrical quad is an electrical cable consisting of four conductors (essentially, electrical wires).  The two quads are intended to be redundant and capable of independently operating the Clipper oil and gas wells, with the "B" electrical quad being a backup in the event the "A" quad ceased operating properly.

17.     For a subsea umbilical of typical length, the conductors are assembled into quads and packed into the outer jacket along with the hydraulic tubes in a continuous

length.  However, Parker's Texas facility could not accommodate the Umbilical's length, which was approximately 87,000 feet, or about 16 miles.  Instead, Parker manufactured the quads in sections, using multiple splices to create the required finished length.

18.     In addition to lacking a facility capable of manufacturing the electrical quad one continuous length, Parker lacked a sufficient number of properly trained and experienced personnel to perform the splices in the time dictated by its manufacturing timeline.  Parker's putative solution to this problem was to send two of its employees to Tyco, the manufacturer of the conductors being assembled into the quads, for a crash course in Tyco's splicing technique.  Despite this rushed and inadequate training, Parker allowed these employees to perform the splicing of the quads for the Umbilical without supervision.

19.     Parker stated that it conducted multiple tests of the Umbilical before, during, and after it completed the manufacturing process.  However, none of its tests were conducted while the Umbilical was under conditions simulating the subsea environment where it was to be installed.  Parker represented that this limited testing was sufficient to show that the Umbilical worked properly and was free from defects. Ultimately, that representation was incorrect.

**D.     Parker oversaw the installation of the defective Umbilical.**

20.     Bluewater engaged Technip USA, Inc. ("Technip") to install the Umbilical under a subcontract agreement with Bluewater.

21.     In late October and early November, the Umbilical was "transpooled," *i.e.,* transferred onto a large horizontal reel located on a Technip barge.  This process was supervised by Parker representatives as well as representatives of Bluewater and Technip.

22.     After the Umbilical was transpooled onto the barge, it was transported from Parker's facility in Texas to the location of the Clipper Project, where the Umbilical was laid on the seabed between the Platform and the Clipper Project oil and gas wells and attached to both the Platform and the wells.

23.     Parker representatives were onboard the barge at all relevant times after it left Parker's Texas facility.  Parker representatives were present during, and oversaw, the entire installation process.  Parker thus had ample opportunity to observe the installation process and to inspect the Umbilical both during and after installation.  At no time did Parker raise any issue with the process or the final installation of the Umbilical.

**E.     The defective Umbilical failed.**

24.     Once installed, the Umbilical was tested on or about December 31, 2012. At that time, both the electrical and hydraulic portions of the Umbilical appeared to be functioning properly.

25.     The Clipper well to which the Umbilical was ultimately connected was brought on line on or around March 15, 2013.  On April 4, 2013, approximately three weeks after first oil production from the well, the Umbilical lost electrical connectivity in the "A" electrical quad.  The well control system was then transferred to the backup "B" electrical quad.  However, the "B" quad also lost electrical connectivity within hours. Since that time, both of the electrical quads have been inoperable.  The hydraulic functions of the Umbilical were unaffected and remain in operation to this day.

26.     Shortly after April 4, 2013, Bluewater notified Parker, orally and in writing, that the electrical quads ceased working properly and their failure gave rise to a potential warranty claim relating to the Umbilical.  From that point forward, Parker's

7

representatives were kept apprised of efforts by Bluewater, ATP, and others to determine the cause of the loss of electrical connectivity.  Additionally, Parker's representatives made requests for specific information regarding the failure of the Umbilical and the subsequent investigation into its cause and were given all the information that they requested to evaluate the warranty claim.

**F.      Bennu purchased the Clipper Project.**

27.      On or around August 17, 2012, prior to the installation of the Umbilical, ATP, who had been experiencing significant financial problems unrelated to the Clipper Project, filed a voluntary petition under chapter 11 of the Bankruptcy Code, thus initiating Case No. 12-36187-H1.  ATP was unable to reorganize and conducted a marketing and auction process for the sale of substantially all of its assets.  Bennu Oil & Gas, LLC ("Bennu"), a special purpose entity formed by a group of ATP's prepetition and DIP lenders, was the successful bidder and, by an order dated October 17, 2013 (the "Final Sale Order"), the bankruptcy court overseeing ATP's chapter 11 case (the "ATP Bankruptcy Court") approved the proposed sale.  Bennu thus became the owner of substantially all of ATP's assets, including the Lease and the Clipper Project.  The sale also included the assumption and assignment to Bennu of Bluewater's contracts with ATP related to work on the Clipper Project—the MSA, the ARMSA, and Work Order II (collectively, the "ATP Contracts").

**G.      Parker's attempts to shirk its responsibility for the Umbilical's failure.**

28.      Even though it received timely notice from Bluewater of the Umbilical's failure, Parker never demanded or requested that ATP, Bluewater, or any other party remove the Umbilical from the Gulf of Mexico seabed and return it to Parker, as it now

8

asserts was required under the warranty language in the Terms and Conditions. Parker also did not communicate to any person that Parker intended to deny any warranty claim if the Umbilical was not transported to Parker's facilities in Texas. To the contrary, Parker actively participated in the decision to leave the defective Umbilical on the sea floor, which it facilitated by selling to Bennu, at a discount, a replacement umbilical containing only electrical quads. That replacement umbilical was installed alongside the existing Umbilical but, because it lacked any hydraulic tubes or capability, this solution—developed with Parker's direct participation—made it necessary to leave the original Umbilical in place.

29.     It is unsurprising that Parker did not request that the Umbilical be returned to Parker's facilities because Parker knew that Bluewater would not have been able to comply with such a request. As an initial matter, Parker knew that the Umbilical was manufactured for sale to ATP by Bluewater. As ATP's successor-in-interest as the owner of the Umbilical, Bennu, rather than Bluewater, had the final say as to the removal of the Umbilical. Once the Umbilical was installed, Bluewater lost any right to require that the Umbilical be pulled and returned to Parker.

30.     Parker also knew that neither ATP nor Bennu would have agreed to removing the Umbilical after installation. The continued operation of the Clipper wells was a critical component of the value of ATP's assets—both as part of ATP's bankruptcy estate and as part of the asset package purchased by Bennu. The hydraulic components of the Umbilical, which have remained in continuous operation since installation, are necessary to the continued production of hydrocarbons from the Clipper wells. Thus, pulling up the Umbilical from the bottom of the sea would have halted production and

9

caused a significant interruption of Bennu's revenue stream, if not its outright loss. Moreover, because the Clipper wells and their associated infrastructure are subject to federal regulation, any removal of the Umbilical would have required regulatory approval.

31.     Further, removal of the Umbilical from the sea bed of the Gulf of Mexico and its return to Parker would have been simply economically impractical.  The cost of pulling a sixteen-mile long Umbilical from the bottom of the Gulf of Mexico onto a vessel and transporting it back to Parker's facility, taken with the economic consequences of shutting in the Clipper wells, would dwarf the cost of simply purchasing and installing a new umbilical, thus completely defeating the ostensible purpose of Parker's warranty. Moreover, the Umbilical quite possibly might have sustained damage during the removal process, which would have made it impossible to determine the true cause of its failure.

32.     Given these facts, Parker has waived any right to insist that Bluewater's return of the Umbilical is prerequisite to its liability under its warranty and is estopped from asserting that it is not liable to Bluewater on that basis.

**H.     Bennu obtained a judgment against Bluewater regarding the Umbilical.**

33.     After acquiring ATP's assets, Bennu filed an adversary proceeding against Bluewater in the ATP Bankruptcy Court (the "Bennu Action"), asserting that Bluewater was liable to it under the ATP Contracts for breach of contract and breach of warranty for selling a "defective umbilical."[1]  Bennu alleged that the Umbilical was defective in

---

[1] Case No. 14-03001; In the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bennu Action") at Docket Entry No. 1.  Compl. at ¶40. *See also, id.* at ¶56(a) (alleging "failure to provide ... a serviceable, defect-free umbilical"); ¶56(b) (alleging the umbilical was "unsuitable and defective").

terms of both design and materials/manufacturing.[2]   Based on these allegations, Bennu asserted that Bluewater not only was owed no additional money under Work Order II, but that it was also liable to Bennu in damages.

34.   The Bennu Action was tried over a three-week period, ending in December 2014.   Even though Parker was not required to participate in the trial, Parker's counsel attended all of the depositions and was present throughout the trial. Additionally, Philip Malsbary, Parker's Division Project Manager, was deposed and testified as a fact witness at trial.   After taking  the matter under advisement at the close of the trial, the ATP Bankruptcy Court issued its opinion on July 15, 2015, finding that the Umbilical was defective and that Bennu incurred $29,709,192.00 in damages against Bluewater.   After deducting $16,522,937.61 for amounts owed to Bluewater for contracts assumed by Bennu, the Court found damages of $13,186,254.39, plus post-judgment interest.   The ATP Bankruptcy Court entered judgment in favor of Bennu against Bluewater in this amount (the "Judgment").

35.   In its opinion, the ATP Bankruptcy Court cited extensively to the testimony of Geoff High, an expert retained by Bennu.   Mr. High testified at some length as to the cause of the Umbilical's loss of electrical connectivity.   In particular, Mr. High testified that the most likely cause of the failure of the electrical quads was seawater ingress through the outer jacket of the Umbilical and into the quads.  Mr. High stated his opinion that, because both the outer jacket and the electrical quads themselves are supposed to be watertight, the ingress of water was likely the result of

---

[2] *Id.* at ¶56(a); (alleging "failure to provide materials that are free from defects in design and/or workmanship"); ¶59 (alleging "failure to provide...an umbilical free from defects in design, workmanship, and materials").

design and manufacturing defects.  Mr. High further opined that the splicing procedures used by Parker "fell below acceptable quality standards," that Parker's testing of the splices fell "below comparable industry standards," and that the positioning of the electrical quads on the outer cross-section of the Umbilical made them "vulnerable to damage and therefore seawater ingress." Mr. High concluded that the Umbilical's electrical quads, as designed and manufactured by Parker, were not "fit-for-purpose under comparable industry standards."

36.    The ATP Bankruptcy Court thus found that the evidence fully supported the finding that the Umbilical was defective in its design and manufacture.  However, Bluewater—which neither designed nor manufactured the Umbilical—is the only party that has so far been held responsible.

## PROCEDURAL MATTERS

37.    On February 12, 2014, Bluewater asserted a third-party demand against Parker in the Bennu Action seeking damages related to the sale and failure of the Umbilical.[3]  On August 29, 2014, Bluewater filed its First Amended Third Party Demand, asserting claims of breach of contract/warranty, contractual indemnity, and contribution against Parker.[4]

38.    On September 22, 2014, Parker filed a Motion for Summary Judgment seeking dismissal of Bluewater's claims against Parker.[5]  Prior to Bluewater filing a response to the Motion for Summary Judgment, however, Bluewater and Parker reached

---

[3] Bennu Action at Docket Entry No. 27; Case No. 17-03289; In the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Severed Action") at Docket Entry No. 2
[4] Bennu Action at Docket Entry No. 89; Severed Action at Docket Entry No. 11.
[5] Bennu Action at No. 103; Severed Action at Docket Entry No. 15.

12

an agreement under which Bluewater's claims against Parker would be severed from the Bennu Action and only tried if the Bennu Action resulted in a judgment against Bluewater.[6]   The Honorable Judge Marvin Isgur entered an order severing Bluewater's claims against Parker from the Bennu Action on September 24, 2014.[7]   After the Judgment was entered, on February 3, 2016, the Bennu Action was administratively closed, leaving Bluewater's claims against Parker unresolved.

39.     Bluewater lacked the financial ability either to satisfy the Judgment or to appeal it.  Consequently, on October 20, 2015, Bluewater filed a voluntary petition for relief under chapter 7, initiating the bankruptcy related to this adversary proceeding.  The Trustee was duly appointed as chapter 7 trustee for Bluewater's estate.

40.     On March 8, 2017, the Trustee moved to reopen the Bennu Action and substitute in as a party in Bluewater's place, and the Trustee's motion was granted on June 15, 2017.[8]   On the same day, the Honorable Judge Marvin Isgur severed Bluewater's claims against Parker from the Bennu Action into a new adversary proceeding (the "Severed Action").[9]   In the Severed Action, Bluewater's claims against Parker, as well as Parker's Motion for Summary Judgment seeking dismissal of those claims, remain pending.

41.     On May 12, 2017, the Trustee sought leave to file a Second Amended Third-Party Demand to assert additional claims against Parker for violation of the Ohio

---

[6] Bennu Action at Docket Entry No. 105; Severed Action at Docket Entry No. 17.
[7] Bennu Action at Docket Entry No. 109.; Severed Action at Docket Entry No. 19.
[8] Bennu Action at Docket Entry No. 196.; Severed Action at Docket Entry No. 33.
[9] Bennu Action at Docket Entry No. 209 & 210.

Deceptive Trade Practices Act and statutory indemnity under Chapter 82 of the Texas Civil Practice and Remedies Code.[10]  The court denied the Trustee leave to do so.[11]

42.     Pursuant to Section 546 of the United States Bankruptcy Code, the Trustee's deadline to assert additional claims against Parker expires on October 20, 2017. *See* 11 U.S.C. § 546.  To avoid any prejudice to the assets of Bluewater's bankruptcy estate, the Trustee files this Original Complaint.[12]

## CAUSES OF ACTION

**A.     Parker is liable for Breach of Contract and/or Breach of Warranty.**

43.     Bluewater repeats and re-alleges preceding paragraphs as if fully restated herein in their entirety.

44.     Parker designed and manufactured the Umbilical.  As set out in the Purchase Order, Parker warranted the Umbilical against design or manufacturing defects, and the Purchase Order required Parker to provide the Umbilical without design or manufacturing defects.  Parker failed to do so.

45.     As a result of design or manufacturing defects, the Umbilical's two electrical quads ceased functioning on or about April 4, 2013, and Bluewater promptly sent a letter to Parker putting it on notice of a potential warranty claim based on the failure of the Umbilical's electrical quads.

---

[10] Bennu Action at Docket Entry No. 208.; Severed Action at Docket Entry No. 45.
[11] Bennu Action at Docket Entry No. 210.; Severed Action at Docket Entry No. 46.
[12] Claims for contribution and breach of contract and/or warranty are already pending in the Severed Action, but they are asserted in this filing as well.  In the event Parker's Motion for Summary Judgment in the Severed Action is granted, the Trustee will voluntarily dismiss the claims in this proceeding that are duplicative of any claims that are dismissed with prejudice under the order granting Parker's Motion for Summary Judgment.

46.     Parker breached its warranty against design and manufacturing defects and is, accordingly, liable to Bluewater for its damages, including those sustained as a result of the Judgment's entry.

47.     Parker contends that Bluewater is bound by the Terms and Conditions, including but not limited to liability limitations and limited warranty requirements therein.  If a finder of fact concludes that Bluewater is not bound by the Terms and Conditions or that the Terms and Conditions are not part of the Purchase Order, Bluewater is entitled to all remedies available to it under Section 1302 of the Ohio Revised Code.

48.     If a finder of fact concludes that Bluewater is bound by the Terms and Conditions, the result is the same, and those remedies remain available to Bluewater despite the liability limitations and limited warranty requirements.   The liability limitations and warranty requirements in the Purchase Order are unenforceable because, if enforced, they would cause Parker's warranty to "fail[] of its essential purpose."  *See* OHIO REV. CODE § 1302.93(B); TEX. BUS. & COM. CODE ANN. § 2.719(b).  As it has been interpreted by Parker, the warranty "fails of its essential purpose" for several reasons, including the fact that it called for Bluewater to take actions that were impossible, impractical, and potentially in violation of federal regulations.   *See id.*  Because the warranty requirements in the Purchase Order are unenforceable, the liability limitations in the Purchase Order are also unenforceable.   *See, e.g., Boyas Excavating, Inc. v. Powerscreen of Ohio, Inc.*, 139 Ohio App.3d 201, 211, 743 N.E.2d 464, 471 (2000) ("consequential damages cannot be excluded by a limited repair and replacement warranty if that warranty fails of its essential purpose.") (citations omitted).  At the very

least, Parker waived the liability limitations and warranty requirements by its active participation in and facilitation of the placement of the replacement electrical umbilical, which put removal of the Umbilical out of the question.

49.    Parker is also liable for breach of contract because it failed to perform and enforce its agreement with Bluewater fairly and in good faith.  Parker owed Bluewater a duty of good faith and fair dealing in its performance and enforcement of its agreement with Bluewater.  *See, e.g., Littlejohn v. Parrish*, 839 N.E.2d 49, 53-54 (Ohio Ct. App. 2005); *see Wells Fargo Bank, N.A. v. Daniels*, 2011 WL 6677982, at *3 (Ohio Ct. App. Dec. 21, 2011) ("every contract contains an implied duty of good faith and fair dealing."); OHIO REV. CODE § 1301.304 (imposing an "obligation of good faith" in the performance and enforcement of contracts for the sale of goods).

50.    In its enforcement and performance of the agreement, Parker acted unfairly and in bad faith.  After the Umbilical failed, Parker did not request that the Umbilical be returned to its facility in Texas and never indicated that such an action was required for Bluewater to obtain relief from Parker.  To the contrary, Parker participated in alternative courses of remediation and ultimately sold Bennu a replacement Umbilical. Parker now claims that, to be entitled to any relief, Bluewater should have returned the Umbilical to Parker's facility in Texas.  By participating in the remediation process and assisting in the implementation of a solution that required the Umbilical to remain in place, Parker indicated that returning the Umbilical to Parker's facility was unnecessary. Accordingly, Parker's actions were misleading, unfair, and in bad faith.  Parker failed to perform and enforce its agreement with Bluewater in the manner required under the law and should be liable for its actions.

51.    As a result of Parker's breach of contract and breach of warranty, Bluewater is entitled to damages, including but not limited to the amount of the Judgment, pre and post-judgment interest, and Bluewater's attorney's fees.

**B.**    **Parker violated the Ohio Deceptive Trade Practices Act.**

52.    Bluewater repeats and re-alleges the preceding paragraphs as if fully restated herein in their entirety.

53.    Prior to entering into the Purchase Order and its amendments, Parker represented to Bluewater that (a) it had the experience and facilities necessary to design and manufacture the Umbilical and (b) it would manufacture the Umbilical free of defects and in a good and workmanlike manner.  Parker's representations were untrue.

54.    Contrary to its representations, Parker lacked the expertise, the personnel, and the facilities necessary to properly design and manufacture the Umbilical, and as a result, failed to manufacture the Umbilical in a good and workmanlike manner and free of defects.  The resulting Umbilical was clearly not fit for its intended purpose—again, contrary to Parker's representations.

55.    As the direct result of Parker's defective design and manufacture of the Umbilical, the Umbilical's two electrical quads ceased functioning on or about April 4, 2013.

56.    Parker's representations that the Umbilical had characteristics, benefits, and uses that it did not have—*i.e.*, that it was free of defects and would remain watertight and function properly under approximately 3,450 feet of sea water, among other things—constitutes a violation of the Ohio Deceptive Trade Practices Act.  *See* OHIO REV. CODE § 4165.02(A)(7).

57.     Further, Parker's representation that the Umbilical was "of a particular standard, quality, or grade"—specifically, that it was constructed in a good and workmanlike manner and in accordance with industry standards—when the evidence has overwhelmingly shown that it was not, constitutes a further violation of the Ohio Deceptive Trade Practices Act.  *See* OHIO REV. CODE § 4165.02(A)(9)

58.     As a result of Parker's breach of contract and breach of warranty, Bluewater is entitled to damages, including but not limited to the amount of the Judgment, pre and post-judgment interest, and Bluewater's attorney's fees.  *See* OHIO REV. CODE § 4165.03(B) (authorizing an award of attorney's fees for violation of the Ohio Deceptive Trade Practices Act).

**C.      In the alternative, Bluewater is entitled to indemnification from Parker.**

59.     Bluewater repeats and re-alleges preceding paragraphs as if fully restated herein in their entirety.

60.     Parker designed and manufactured the Umbilical for Bluewater's benefit, and Parker manufactured the Umbilical entirely in the State of Texas.  After the Umbilical was manufactured, Bluewater sold the Umbilical to ATP.  When it agreed to the terms of the Purchase Order, Parker knew that the Umbilical would be sold to ATP, installed on the seabed, and no longer under Bluewater's control.

61.     After the Umbilical failed as a result of Parker's manufacturing defects, Bennu sued and obtained the Judgment against Bluewater.  As such, Bluewater has suffered damages as a result of Parker's shoddy design and manufacture of the Umbilical.

62.     As a manufacturer that manufactured a defective product in the State of Texas, Parker is obligated to "indemnify and hold harmless" Bluewater against the losses it has incurred.  *See* TEX. CIV. PRAC. & REM. CODE § 82.002.

63.     Parker has failed to uphold its duty to indemnify Bluewater.

64.     As a result, Bluewater is entitled to indemnification from Parker in the form of its "court costs and other reasonable expenses, reasonable attorney fees, and any reasonable damages incurred " *See* TEX. CIV. PRAC. & REM. CODE § 82.002.

**D.     In the alternative, Parker should be held liable in contribution.**

65.     Bluewater repeats and re-alleges preceding paragraphs as if fully restated herein in their entirety.

66.     Parker manufactured the Umbilical, and its representatives were present when the Umbilical was transpooled onto the barge and during the installation of the Umbilical.  Parker's actions and omissions with regard to the Umbilical contributed to the defective Umbilical and Bluewater's losses.

67.     Parker is jointly or solidarily liable for Bennu's purported damages. Parker is, therefore, liable to Bluewater in contribution.  *See* OHIO REV. CODE §§ 2307.25 & 2307.26.

## ATTORNEY'S FEES

68.     The Trustee is entitled to recover his costs and expenses, including reasonable attorneys' fees, incurred in bringing this action and the attorneys' fees incurred by Bluewater in defending the action filed by Bennu.  *See, e.g.,* OHIO REVISED CODE § 4165.03(B); TEX. CIV. PRAC. & REM. CODE § 82.002.  Accordingly, the Trustee seeks judgment against Parker for all such amounts.

## PRAYER

**WHEREFORE,** Ronald J. Sommers, chapter 7 trustee for Bluewater Industries, LP, respectfully prays for the entry of a judgment awarding the Trustee (i) damages in the amount of the Judgment, (ii) pre and post-judgment interest, and (iii) Bluewater's attorney's fees, and granting the Trustee all other relief, at legal or in equity to which he may be justly entitled.

Dated:  October 19, 2017
           Houston, Texas

Respectfully submitted,


/s/ *Elizabeth M. Guffy*
David E. Harrell, Jr.
TBN 00793905
Elizabeth M. Guffy
TBN 08592525
Kurt Lance Krolikowski
TBN 24074548
LOCKE LORD LLP
600 Travis, Suite 2800
Houston, Texas  77002
Telephone:  713-226-1200
Facsimile:  713-223-3717
E-mail:  dharrell@lockelord.com
             eguffy@lockelord.com
             kkrolikowski@lockelord.com

**ATTORNEYS FOR RONALD J. SOMMERS, CHAPTER 7 TRUSTEE FOR BLUEWATER INDUSTRIES, L.P.**

20